ESTATE OF ROBERT J. TIFFANY, DECEASED.

[No 5,317; decided December 24, 1887.]

Will—Testamentary Capacity—Intoxication.—A man temporarily overcome by a single debauch is, for the time being, of unsound mind, and has not testamentary capacity; so a person to whom intoxication has become such a habit that his intellect is disordered and he has lost the rational control of his mental faculties, is of unsound mind.

Will Contest.—Where the Questions of Unsoundness of Mind and Undue Influence are presented in the same case, and in their consideration may overlap one the other, it has been said that as legal propositions they are to be kept distinct and apart. But considering the two issues together, it is noted that although mere weakness of intellect does not prove undue influence, yet it may be that in such feeble state, with the mind weakened by sickness, dissipation or age, the testator more readily and easily becomes the victim of the improper influences of those who see fit to practice upon him.

Will—Unreasonableness does not Vitiate.—The will of one having testamentary capacity cannot be avoided because unaccountably contrary to the common sense of the country. If not contrary to the law, it stands for the descent of his property, whether his reasons for it are good or bad, provided they are his own reasons, not influenced by the unlawful influence of others.

Will—Undue Influence.—There is a Distinction Between the Influence of a Lawful Relation and that of an unlawful relation. A lawful influence, such as that arising from legitimate family and social relations, must be allowed to produce its natural results, even in influencing the execution of a will. However great the influence thus generated, there is no taint of unlawfulness in it; nor can there be any presumption of its unlawful exercise merely because it is known to have existed and to have manifestly operated on the testator's mind as a reason for his testamentary disposition. It is only when such influence is exerted over the very act of devising, preventing the will from being truly the testator's act, that the law condemns it as vicious.

Will—Undue Influence.—While the Natural Influence of a Lawful Relation must be lawful, even where affecting testamentary dispositions, the natural or ordinary influence of an unlawful relation must be unlawful, in so far as it affects testamentary dispositions favorably to the unlawful relations and unfavorably to the lawful heirs. So, it would be doing violence to the morality of the law, and thus to the law itself, if courts should apply the rule recognizing the natural influence arising out of legitimate relationship to unlawful as well as

to lawful relations; and thereby make them both equal, in this regard at least, which is contrary to their very nature.

**Maxim.—No One Shall Derive any Profit, Through the Law, by the** influence of an unlawful action or relation.

**Wills—Undue Influence.—If the Law Always Suspects and Inexorably Condemns** undue influence, and presumes it from the nature of the transaction, in the legitimate relations of attorney, guardian and trustee, much more sternly should it deal with unlawful relations, where they are, in their nature, relations of influence over the kind of act under investigation. In their legitimate operation, trust positions of influence are respected; but where apparently used for selfish advantage they are viewed with deep suspicion; and it would be strange if unlawful relations should be more favorably regarded.

**Will—Undue Influence.—General Cases and Authorities, as to what** does and what does not constitute undue influence, are inapplicable in a case where the influence charged originated and was exercised under an unlawful relation.

**. Will—Insane Delusion.—If a Person Persistently Believes Supposed Facts** which have no real existence except in his perverted imagination, and against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence, he is, as far as they are concerned, under a morbid delusion; and delusion in that sense is insanity. So, if a testator labored under such a delusion in respect to his wife and family connections, who would naturally have been the objects of his testamentary bounty, and the court can see that the dispository provisions of his alleged will were or might have been caused or affected by the delusion, the instrument is not his will.

**Will—Evidence of Undue Influence.—Upon the issue of undue influence** in the execution of wills, the evidence must often be indirect and circumstantial. Very seldom does it occur that a direct act of influence is patent; persons intending to control the actions of another, especially as to wills, do not proclaim the intent. The existence of the influence must generally be gathered from circumstances, such as whether the testator formerly intended a different disposition; whether he was surrounded by those having an object to accomplish, to the exclusion of others; whether he was of such weak mind as to be subject to influence; whether the instrument is such as would probably be urged upon him by those around him; whether they are benefited to the exclusion of formerly intended beneficiaries.

**Will—Intoxication and Undue Influence.—The testator in this case** had been a prominent and respected citizen, but for some years before his death he became an habitual drunkard, and after becoming such his whole being changed with respect to his affection for his wife and children, as well also in his personal habits and his social

nature and disposition. During this period he became acquainted, while taken away from home, with a woman whom he permitted to act as his nurse; and who subsequently obtained a control over him, to the exclusion of his family, and so that he never again returned to his wife or children. Six months before his death he executed a will wherein this woman was made residuary legatee, and for nearly all his estate; his wife and children were expressly excluded by the instrument. They contested the probate of the will, and tendered as issues unsoundness of mind, and undue influence exercised by the residuary legatee. The court found in favor of the contestants upon both issues, and denied the probate of the will.

W. W. Foote and T. C. Coogan, for contestants.

E. N. Deuprey, for respondents and proponents, J. W. Brumagim and W. M. Pierson.

COFFEY, J. On the tenth day of June, 1886, there was filed in this court the petition of William M. Pierson and John W. Brumagim, setting forth that Robert Joyce Tiffany died on the sixth day of June, 1886; that he was a resident, at the time of his death, of the city and county of San Francisco, state of California, and left an estate in said city and county consisting of real and personal property, the real estate consisting of about fourteen parcels of land, one parcel of land improved with buildings and the others vacant; that the improved real estate brings in a rental of about $200 a month, all of which real estate is valued at about $30,000, and personal property at about $500; all of which real and personal property is alleged to be the separate property of the deceased. That said deceased left a will dated the 15th of November, 1885, and a codicil bearing the date the 15th of December, 1885, in the possession of the petitioner, Pierson, which the petitioners believe and allege to be the last will and testament of the deceased; that the petitioners, Pierson and Brumagim, are named in said will as executors; that Cecilia Harvey McGregor, infant daughter of Emma M. McGregor, Alice Tiffany, the Old People's Home of San Francisco, the managers of the Kindergarten School on Mission street near Twenty-ninth street, San Francisco, the Boys' and Girls' Aid Society of San Francisco, Willie Patterson, Mrs. John Marshall and Mrs. Lura Churchill are named in said will as legatees and devisees;

that said Cecilia Harvey McGregor and Willie Patterson are minors, and reside in said city and county of San Francisco; that Alice Tiffany is the adult sister of the deceased, and resides out of the state of California, and in the state of New York; that Mrs. John Marshall and Mrs. Lura Churchill are adults and reside in San Francisco; that the said Old People's Home, the managers of said Kindergarten School and the Boys' and Girls' Aid Society are charitable and educational institutions existing in San Francisco; that the subscribing witnesses to said will are Walter B. Anderson and Charles Rowell, and to said codicil George W. Reynolds and S. H. Regensburger, all residing in San Francisco; that the next of kin of said testator and his heirs at law are; Phoebe Jane Tiffany, his surviving wife, Peer Tiffany and William Tiffany, his sons' of adult years, and his daughter Emma M. McGregor, of adult years, residing in said city and county; that at the time said will was executed, to wit, on said fifteenth day of November, 1885, and at the time said codicil was executed on said fifteenth day of December, 1885, the said testator was over the age of eighteen years of age, to wit, over sixty years, and was of sound and disposing mind and not acting under duress, menace, undue influence or fraud, and in every respect was competent by last will to dispose of all his estate, and that said will was duly executed according to law. Wherefore, the petitioners pray that the will and codicil be admitted to probate.

The will and codicil referred to in the foregoing petition are in the following words:

"(1.) I bequeath to said Cecilia Harvey McGregor, my grandchild, the daughter of my daughter Emma M. McGregor, the sum of five hundred dollars, to be paid to the said Emma M. McGregor for the use of her said daughter.

"(2.) I bequeath to my sister, Alice Tiffany, five hundred dollars.

· "(3.) I bequeath to the Old People's Home of San Francisco five hundred dollars.

"(4.) I bequeath to the Manager or Managers of the Kindergarten School on Mission street, near Twenty-ninth street, San Francisco, five hundred dollars.

"(5.) I bequeath to the Boys' and Girls' Aid Society of San Francisco five hundred dollars.

"(6.) I direct that a scholarship in the best business college in San Francisco be bought by my executors in the name and for the benefit of little Willie Patterson, the grandson of P. J. Cody.

"(7.) All the rest and residue of my real estate, personal and mixed, I devise and bequeath to Mrs. Lura A. Churchill, who has been to me in all my sickness a true and tender friend and nurse.

"(8.) Should any of the bequests to any of the educational or charitable organizations in this will fail for any reason, then such bequests are to go into the rest and residue of my estate.

"(9.) I have made no provision in this will for my wife, nor for my children, Peer, William and Emma, for the reason that by a deed and agreement of separation made some years ago between myself and wife, she was fully provided for, and for the further reason that the conduct of my said wife and children towards me since that time does not commend them, or either of them, to my consideration.

"(10.) I now make and appoint John W. Brumagim and William M. Pierson the executors of this will, and direct that no bonds be required of them for the performance of their duties as such executors; and I further direct that if it shall be considered advisable by my said executors to sell all or any portion of my estate, they may do so without the order of any Court.

"In witness whereof I have hereunto set my hand and seal, this fifteenth day of November, in the year eighteen hundred and eighty-five.

"[SEAL]                          R. J. TIFFANY."

(Here follows attestation clause.)

"Witnesses:

"WALTER B. ANDERSON, 426 Kearny Street.

"CHARLES ROWELL, 1330 Pine Street.

"By this codicil to the above last will and testament, I bequeath to Mrs. John W. Marshall, of San Francisco, the

sum of five hundred dollars, and in all other respects con·firm and publish said will.

"San Francisco, December 15, 1885."

(Here follows attestation clause.)

"Witnesses:

"GEORGE W. REYNOLDS, 609 Sacramento Street.

"S. H. REGENSBURGER, 214½ Grove Street."

### STATEMENT OF CONTEST.

On the fifteenth day of September, 1886, there was filed an amended contest by the widow and children of the deceased to the probate of the instruments hereinabove copied, in which were alleged as reasons for contest and grounds of opposition (1) that at the time of the execution of said will and of the codicil said deceased was not competent to execute said will or said codicil and was not at either of said times of sound and disposing mind, but was incompetent to execute said will or said codicil, he being at both said times insane; (2) that at both the times last above mentioned said deceased was, and for many years prior thereto had been, habitually intemperate from the excessive use of intoxicating liquors, and was by reason thereof incapacitated from and incompetent to execute said will and said codicil. And, for a further and separate ground of opposition and contest, it was alleged that at the time of the execution of the said will and codicil the said deceased was not free from duress, menace, fraud and undue influence, but said deceased was at both times unduly influenced by the residuary legatee named in said will to execute both said will and said codicil; and in support of the allegation of undue influence on the part of the residuary legatee the contestants allege as follows, that:

(a) Prior to the execution of said will and said codicil the said residuary legatee induced the deceased to separate from his said wife and children, and to occupy the same apartments occupied by her at a lodging-house situated at the southeast corner of Fifth and Market streets, in the city and county of San Francisco, and thereafter prevailed upon the deceased to continue his said separation and occupation

of said apartments with her, and he was so occupying them at the times of the execution of said will and said codicil.

(*b*) Prior to the execution of said will and said codicil, and prior to the time he separated from his wife and children, and while he was so living separate from them, as last above stated, the said residuary legatee poisoned the mind of the deceased against the contestants by falsely asserting to the deceased that the contestants had caused him, the deceased, to be placed in an insane asylum and in the Home for the Inebriates, situated in the city and county of San Francisco, without any cause; and that they, the contestants, were inimical to him, and would again place him in an insane asylum or Home for the Inebriates if he should return and live with his wife and children; that deceased believed these assertions of the residuary legatee, and at the times of the execution of said will and said codicil the deceased was laboring under the delusion that they were true; and the contestants allege that said assertions, each and all of them, were false, and known to the residuary legatee to be such.

(*c*) Prior to the execution of said will and said codicil said residuary legatee abused contestants in the presence of deceased, and told him that contestants had turned him out of his own home and into the streets; that contestants had no love for him, and that she was the only true friend that he had; and that the reason why contestants desired the deceased to live again with his wife and children was that they, the contestants, might thereby obtain control of his property, and, if they did so, they would then turn him into the streets penniless; and at the times last above mentioned said deceased was laboring under the delusion that these statements were true; and the contestants allege that said assertions, each and all of them, were false, and known to the residuary legatee to be such.

(*d*) While deceased was living at the same apartments as the residuary legatee, as above stated, and for some time prior to the execution of the said will or codicil, and even subsequent thereto, said residuary legatee was not willing that any of the contestants should see the deceased except .

in her presence; and on one occasion she ordered his said wife out of the said apartments, and told deceased, in the presence and hearing of his wife, that he must choose between "that woman," referring to his, deceased's, wife, and herself.

(e) Prior to the execution of the said will and the codicil said residuary legatee persuaded deceased to transfer to her, without any consideration, certain of his real estate and certain of his personal property; that she concealed all these transfers from contestants, and at the times of the execution of said will and the codicil she had complete control of the deceased's mind.

(f) Said deceased for several years prior to his death was in the habit of using intoxicating liquors to excess, and was easily influenced by anyone who would supply him with such liquors; and that said residuary legatee, contrary to the advice and directions of the physicians of deceased, prior to, at the time of and subsequent to the execution of said will and the codicil, constantly supplied the deceased with intoxicating liquors, and thus obtained such control over deceased as to unduly influence him.

### RESPONSE OF PROPONENTS.

On November 1, 1886, the proponents answering denied generally and specifically each and every of the allegations of the contest.

The trial of the issues thus joined began on the 18th of January and ended on the 3d of September, 1887, occupying from first to last ninety-two days. Of course this period did not include a continuous consumption of time, for the struggle was intermittent in its character, owing partly to conflicting engagements of one or the other of the counsel, and partly to the demands of other business pressing upon the court. The actual time consumed in the trial and the arguments was about three hundred and fifteen hours, or sixty-three days of five hours each, which was the average daily length of the trial, as appears from the two hundred and thirty-five pages of the legal-cap notes taken by the judge. There were forty-eight witnesses examined for con-

testants, fifty-three for proponents and ten in rebuttal, making a total of one hundred and eleven. The cause was most stubbornly contested by the counsel for the respective parties, and every legitimate weapon of forensic warfare was used with skill and dexterity by the advocates for either side. In such a conflict the vanquished party can attribute the result only to the lack of merit in his cause or to the mistaken judgment of the judge, who may have failed to weigh accurately the facts or to apply correctly the law. However the court may err, the counsel have capably and conscientiously discharged their duty.

### POINTS OF CONTROVERSY.

This controversy is reduced by the evidence to two points:

1. Was the testator of unsound mind at the dates of the execution of the instruments propounded as his will and codicil?

2. Was he unduly influenced in the disposition he made of his property by the residuary devisee and legatee named in the said instruments?

Robert Joyce Tiffany died in San Francisco, June 6, 1886, having been born about sixty-six years prior to that date in Albany, New York. He was married to the contestant, Phoebe, in New York City, April, 1845. He came to California in 1849, and after a few years returned to New York, and came back in 1856. His wife followed him in a few months, and thereafter they lived in domestic harmony in San Francisco until he retired with a considerable fortune from the business of manufacturing and vending hats, in which he engaged on his second advent from New York, in or about 1856. He was also a director in the Savings and Loan Society, a most important and flourishing financial institution, known popularly as the Clay Street Savings Bank, from 1863 to 1878. Some time after he retired from active employment in the hat business he began a habit of unusual indulgence in liquor, and in the summer of 1878 a trip was made to Europe with a view to correcting this infirmity, and by a temporary separation from unfavorable influences and associations to restore him to his former temperate habits.

But the result was not the reform anticipated or hoped for, for upon his return to San Francisco, in the fall of 1878, he resumed his habits of drinking, indulging at times to excess and for protracted periods. Before this time, when it is alleged the radical change occurred in his character, and while he was actively engaged in affairs which demanded regularity and punctuality in performance, the evidence shows that he was a careful and continuously energetic man of business and successful in his pursuit; he was very neat and precise in dress, courtly and gallant in address, a model of deportment, and a man of reasonable judgment and due discretion in all his concerns. Upon these points, up to a certain time, there is no divergence of testimony. Prior to the present decade the evidence does not indicate that the mind of the decedent had suffered material injury or had become unhinged by abuse of ardent spirits. But about the year 1880 a change began to be observed by many persons among his acquaintances; then those who had previously noted his neatness of apparel and circumspectness of conduct remarked an alteration. About this time he became quite dissipated; he was seen frequently in public under the influence of intoxicants; he was often encountered in shabby habiliments, and disordered by drink to such a degree that some of his old friends avoided him, his condition and conversation making intercourse intolerable. Herein was a radical change from his earlier years, when he was one of the most amiable and pleasant gentlemen to be met with, refined and polished in manner and utterance. Those who were formerly entertained by his conversation became disgusted at his coarse and salacious speech and accompanying eccentricities of conduct. Many instances are related in the testimony for contestants which tend to show a material moral modification of character in the testator from 1880, increasing in intensity to the time of his last illness. From the period of his return from Europe, in the latter end of 1878, until his final separation from his wife, the domestic history was one of affliction and trial, caused by his irregularities and the endeavors of his wife and family to reclaim him from his evil courses and associations. The European tour

failed of its purpose, for upon his return he evinced no improvement. From that on the family lived at different boarding-houses; first at the Chamberlain, where they remained until the latter part of 1881; this was at the corner of Bush and Stockton streets, when, upon the marriage of his daughter, the family being broken up in a measure, he took a room at Mrs. Harding's, on Taylor street, and his wife went to her daughter's place, and subsequently, at his request, joined her husband; after a month or six weeks he made another change to a Mrs. Allen's, on Powell street, where he and his wife stayed for about a month; he became very ill there, and was taken to a place in the country in Napa county, where they sojourned for about two months, when, upon his request, they returned to town to attend to some business, and made their stay at their daughter's house; after his return he came in one day and told his family that he had taken rooms at the corner of Fifth and Market streets, at the house of Mrs. Bither; this was in September, 1881, and his wife assenting to this arrangement accompanied him to that place. This was the house known as No. 1 Fifth street. Here they remained until November 24, 1881. After the first week at the house 1 Fifth street he became quite sick; he would go out and come home intoxicated, and from that became so very ill that it was thought he would not recover; it was here and during this period that his wife first met Mrs. Lura A. Churchill, the residuary legatee. Upon his recovery from this fit of sickness, which lasted several weeks, he went to the house of his daughter, Mrs. McGregor, and was there several months; for a while he seemed to improve, but after a few months he began again to drink to excess; he became in his demeanor violent to the inmates of the McGregor household; he would get up in the night and alarm the members of the family; he would arise and go to the front door in his night clothes; would go into the kitchen and hunt for the carving knife, declaring his purpose to kill them all; it was very difficult to quiet him on such occasions; there appeared to be no provocation proceeding from his family for these outbursts at such times, and it was in striking contrast to his former conduct toward them—before liquor had

made him its victim he was always kind and loving to his wife and children; after that he became the reverse. Many instances are recited in the testimony showing the growth and progress of the disease, which finally, it is claimed, unbalanced his mind to such an extent as to destroy testamentary capacity. On one occasion at the Chamberlain house, in October, 1880, he entered his son William's room at 4 o'clock in the morning in his nightgown and got into the bed, and asked if there was a pistol, saying that it was time he or "mother" (his wife) should die; upon another occasion he went into the same son's coalyard, took off his coat and began to shovel coal; this was done without request or necessity; again he told his son that he had engaged a room opposite his son's coalyard on Ellis street, and one night he awoke and wanted to know where "mother" (Mrs. Tiffany) was, and didn't know where he was himself; upon a visit to this son's coalyard he would give imitations of celebrated characters, such as Edwin Booth, the tragedian, and John L. Sullivan, the pugilist; this mimetic performance was a favorite pastime of his, as several witnesses testify—not in itself standing isolated significant, perhaps, but to be considered in connection with other circumstances; this was in the fore part of 1882; during this period he was frequently intoxicated; he spent his time largely around saloons, until in October, 1882, he went to the eastern states, whence he returned in January, 1883, in very bad order; he was to all appearances demoralized, his dress and person were untidy and unclean, his clothing being in very bad condition, and he complained that he had lost his trunk on the way, he didn't know where; he was very feeble, much emaciated, covered with vermin, and his apparel so infested that it had to be burned up; he told a story of how he fell on the cars, and that they were attacked by "cowboys," and in other ways manifested symptoms of mental disturbance. At a subsequent time, while he was lodging at the Lick House, he would arise at night and give his imitations of his favorite actors, pugilists and wrestlers—his son William was with him at this time; one night William awoke in the front room of the suite, being aroused by his father's striking against the cot

whereon the son was lying; the father was standing over him with a cane in his hand; the son asked him what he was doing; he answered: "I thought you were that damned blackguard Blaney, and I was going to kill you"; Blaney was the name of the attorney who had appeared in the insanity proceedings. At another time he said to his son that this same "Blaney was going to marry mother, and he would kill him and prevent it."

At table he would take a carving knife, and raising it above his head assume a tragic attitude and recite: "Is this a dagger which I see before me?" And again he would pose as the patriot Tell, the slogger Sullivan, the wrestler Muldoon, and other men of mark; these imitations or exhibitions were noticeable for their incongruity as to time and place; other instances are related by witnesses which tend to show a lowered tone as to decency of conduct (see Judge's Notes of Testimony, page 25, lines 19, 20, 21, for a notable illustration); his language was at times grossly vulgar and obscene; whereas, in former years he was habitually chaste and clean in expression and free from profanity, in which latterly he was wont to indulge inordinately; friends of many years' intimate acquaintance were shocked at the change which they observed in this respect (see Judge's Notes, page 50, lines 12-19; also, same page, lines 23, 24, and page 51, lines 1, 2, 3). In the year 1882, on his trip to the east, it was noticed that his conduct was peculiar; among other eccentricities, he sat on the lower step of the car platform, with his feet dangling down (Judge's Notes, page 59); while in the east at this time he acted very strangely, once appropriating from the hotel bar a lemon-squeezer and carrying it with him to his room, and so deporting himself as to attract attention among his acquaintance to the marked alteration in the man from what they had known in early days (Judge's Notes, page 77). He made strange choice of companions; brought to the house of his daughter a character known about town as "Sconchin," and presented him with a cane, and introduced him to the family, to their great astonishment, who, when they discovered the identity of their uninvited guest, hastily withdrew, leaving host and guest alone; at

another time he introduced to his friends an individual known as "Shorty Simpson," whom he kissed and embraced and denominated "his dear friend"; another person known as "the Maori," a prizefighter, was presented in like manner; and again he brings up the rear of a procession of the admirers of a noted fistic champion, one Charley Mitchell, upon that person's arrival in San Francisco, the deceased in a buggy, accompanied by a tattered urchin whom he had picked up on the way and raised to a seat beside him in his vehicle. During his visit to New York, he started out with his son Peer one night to go to a place called "Harry Hill's," a noted free and easy variety show; on the way he encountered a prayer-meeting in progress on the street and stopped, and entered the hall after the meeting adjourned to the inside; after a while the leader of the meeting, "the Salvation Army," asked persons to join, and the deceased stepped forward and signed the roll and asked his son to join, which the latter declined; the leader gave the new recruit a religious volume, which he promised to read; when he returned to his hotel he read the book and then threw it aside, saying it was "damned trash"; after this diversion he resumed his visits to Harry Hill's theater, or dancing and variety hall, and there frequently so acted as to suggest that his mind was not normal.  An incident is related of his conduct in San Francisco, where, at a banquet of the Pioneer Society, he became intoxicated and cut a guest, and had to be taken home in a carriage; he was frantic, and was with difficulty subdued.  Another time, upon the occasion of the funeral ceremonies of General Grant, he dressed himself in the regalia of a past president of the Pioneers, and behaved so boisterously upon the public street that he had to be removed from the procession.  This was noticed by many of his old pioneer friends as a remarkable transformation in character from the period before he had become addicted to the use of ardent spirits (see Judge's Notes, pages 64, 66) ; some observed him in public very greatly intoxicated, his attire awry, hair disheveled, necktie disarranged, vest loose, unbuttoned, and he generally demoralized; these were among the elements of change in conduct and appearance noted by some who

had known him as a model in the opposite direction (Judge's Notes, page 73); he became very greatly changed in all respects (Judge's Notes, pages 74, 75, 76, 77). These are a few among many incidents and instances adduced in evidence to show the inroads gradually made by his drinking habits upon the deceased's condition and character, until his mind was so impaired as to destroy its balance and render him an easy prey to the designs of those who were intent upon securing his property. For years he had been drinking inordinately and habitually; from the time he had retired from active employment and business, he had devoted himself to drink with such diligence as to subject himself almost entirely to its dominion; and an important question in this case is, how far did this habit impair his intellect? While this issue is intimately related to, it is also separable from the other of the two issues to which this contest is confined, to wit: undue influence.

### MEDICAL EVIDENCE.

The testimony of the physicians for the contestant is designed to establish the conclusion that the deceased was afflicted with softening of the brain, the result of long-continued indulgence in intoxicants. The autopsy made June 9, 1886, the death occurring June 6th, showed that "the body was greatly emaciated. On the left anterior portion of the chest four distinct abrasions found. The tissues covering sacrum were in a state of extensive ulceration, evidently bed-sore.

"Thoracic cavity—Heart in a state of fatty degeneration. Muscular walls soft and flabby.

"Lungs—Normal in size, and no adhesions to costal pleura. Fatty degeneration of blood vessels.

"Abdominal cavity—Stomach and bowels empty; evidence of chronic catarrh of both; no signs of ulceration or acute inflammation.

"Liver found to be far advanced in a state of fatty degeneration.

"Kidneys—Left kidney atrophied and contracted, the result of both general and circumscribed inflammation. General inflammation, as the pyramids were entirely obliterated;

circumscribed, as an abscess was present upon superior anterior surface connected with pelvis of kidney and filled with pus. Large deposits of fat found in pelvis of kidney; right kidney contracted and in a state of fatty degeneration; bladder empty.

"Cranial cavity—Dura-mater adherent to cranial bone separated with great difficulty; opaque and thickened, weight one ounce; pia-mater highly injected, brain weight, forty-five ounces; softening of base of lateral ventricles, punctiform injections, softening of cerebellum."

## CONDITIONS PRODUCED BY ALCOHOLISM.

It is testified by two physicians, Dr. James Stanton, the county coroner, and Dr. James Murphy, that these conditions were produced by alcoholism, resulting in softening of the brain, and that this disease must have been in progress for about two years. Softening of the brain was defined by one of these physicians as a progressive disease—retrograde progression—and that even when indulgence in intoxicants ceases the disease progresses (Judge' Note's, page 93). Dr. Stanton testified that the condition of the kidneys "would indicate that he was afflicted with chronic interstitial nephritis, caused by alcoholism and sufficient to cause death; pyenia is blood poisoning caused by absorption of pus by the blood; uremia is blood poisoning caused by absorption of urea (a constituent of urine) by the blood" (Judge's Notes, page 91). Dr. J. Grey Jewell, a resident physician of the Home of the Inebriates, testified that deceased died from softening of the brain, produced by extreme chronic alcoholism, and that the causes were in operation for five years preceding, and that in his judgment deceased was insane six or eight months prior to his death. This physician testified that he knew the deceased for four or five years before his death; deceased had been in the Home of the Inebriates three times; first, for one day, February 3, 1883; second, for one month from January 21, 1884; third, for one month from March 15, 1884. This witness testified that he had had many cases of alcoholic patients; that he had visited deceased at 1 Fifth street; that deceased appeared to be utterly sat-

urated, thoroughly soaked, with alcohol; that he warned the attendant that she would be held responsible if death ensued; that the patient was dying from the effects of the potions (alcohol) given to him. Another physician, Dr. Julian Perrault, who had known deceased sixteen or seventeen years, intimately from 1870, testified that in 1883 deceased was insane from abuse of alcoholic stimulants. Dr. R. Beverly Cole, who had known deceased since 1852, testified that from his observations of the deceased's mental state during the last year of his life he was unqualifiedly of the opinion that he was non compos mentis—not of sound mind (Judge's Notes, page 96). As the cause of decedent's death, the only important testimony at variance with what has been referred to was given by Dr. Washington Ayer. Strangely enough, the physician, Dr. Charles Rowell, who attended the deceased in his last sickness, and who certified to the cause of his death, was not examined as to the assigned cause, but was questioned on the direct examination only as to the fact and circumstances of the execution of the will, to which he was a subscribing witness. No question was put to him as to the truth of the certificate of decedent's death, which stated that he died of "typhoid fever." In this connection the testimony of Dr. Ayer should be considered, as he is the only physician introduced to combat the medical testimony for contestants. (Dr. Sharkey was not examined as an expert to this point: see Judge's Notes, page 114.) Dr. Ayer is a doctor of high degree, forty years' practice, Professor of Hygiene in University of California, and an author of medical treatises and assays, and a pioneer associate, acquaintance and friend of the deceased, and well qualified to oppose his opinion to that of any other physician as to the question here involved, and it becomes of consequence, therefore, to note whether he is in substantial accord or in essential conflict with the medical witnesses for contestants. Dr. Ayer testified in substance upon this point: He was first called in to attend the deceased professionally on April 20, 1886, and down to June 7, 1886, from recollection, he should say he paid him about fifteen visits; the deceased was suffering from a deep-seated abscess in the pelvis, in the left side

of the pelvis, lumbar muscle. From Dr. Ayer's diagnosis of the case, that was the principal disease. The deceased was very much prostrated, in a state approaching anemia, assimilating low grades of typhoid, but could hardly be classified as typhoid. The witness prescribed remedies for the deceased to tone up his system; among other things, he prescribed whisky combined with egg, or "egg nog," and gave directions that some stimulant might be given occasionally, in the discretion of the nurse. In his opinion anemia was the cause of the death of the deceased; he did not think the cause of the death was uremia; he did not treat deceased for alcoholism, and found no evidence of alcoholism. After having examined the memorandum of autopsy made by Dr. Stanton and Dr. Murphy, the witness said that the clinical conditions presented no such symptoms, and that these autopsical phenomena might possibly have been postmortem. From the minutes of that autopsy the witness should say that physicians might have found uremia as the cause of death; another physician might have said it was pyemia; the abscess was the principal cause of the conditions of the deceased's last illness, but his advanced age and the faltering forces of nature producing incapacity to resist the invasions of disease, also contributed to the end. It was not a case of typhoid fever; death was not caused by typhoid fever. The only professional relation the witness ever had with the deceased was during the latter's last illness; he preserved no memorandum of his visits, nor did he make any charge. He had a friendly consideration for the deceased, as well as a professional relation. After his first call upon the deceased, he made the usual inquiries about his illness, and after inquiry and examination he prescribed poultices—flaxseed meal, and anodynes, sulphate of morphia and bromide of ammonium—the office of these anodynes is to allay pain; the bromide is to produce sleep without allaying pain. When the witness so prescribed Dr. Rowell was present. In the judgment of Dr. Ayer, as a medical man, the deceased did not die of typhoid fever. The witness said that postmortem is not always the means of determining the cause of death; where there are obscurities it is usually the positive means of ascertaining the cause of death; where much time

elapses, changes may occur between the time of death and the time of examination, which would cause decomposition and disintegration, thus obscuring the cause of death. Dr. Ayer agreed with Dr. Murphy and the other physicians that softening of the brain is a progressive disease, yet thought there might be cases in which the progress of the disease might be arrested, and the brain restored to its normal condition (Judge's Notes, pages 171, 173 and 176). Dr. Ayer's testimony disposes of the typhoid theory completely, and, taken as a whole, it does not contradict the positive testimony of the physicians for the contestants, that the deceased's death was caused by alcoholism.

The result of all the doctors' evidence is that the deceased came to his end by alcoholism, accelerated by the conditions described by Dr. Ayer as the accompaniments of old age, lessening the capacity to resist the inroads of many years of undue indulgence in intoxicants.

From the time the decedent left the regular routine of business he became more and more addicted to the habit of drink, until it gradually effected a change in his character and conduct that was noticed by all his old-time friends. It is true some testify that this was observable only in his periods of intoxication, and that in his sober moments he was as sensible as any other person; but intoxication became such a constant quantity with him as to affect his physical and mental organization to such a degree as to render him easily susceptible to the most immediate influence which encouraged indulgence. The evidence shows that when in normal condition the testator's general business capacity was equal, if not superior, to the average of mankind. He was the owner of what may be considered large property, not requiring, perhaps extraordinary ability, but yet good judgment, prudence and diligence for its successful management; and this property was not only preserved, but the amount was augmented by him. Notwithstanding that it was thought necessary to take steps more than once to place testator in custody of the law as an incompetent, yet some persons of fair judgment and unimpeached integrity have given their opinion that he was the same throughout life; but this business capacity may co-

exist with monomania; and even assuming that liquor had not produced a total obscuration of the testator's intellect, yet there may have been a partial eclipse sufficient to avoid this instrument as a will: American Bible Soc. v. Price, 3 West. Rep. 69. A monomaniac may make a valid will, when its provisions have no connection with the particular delusion, and there is no reason to think such provisions are influenced by it; but when the delusion relates to the persons who would in the natural and usual course become the objects of the maker's care, solicitude and bounty, and especially upon whom the law would cast the inheritance of his property, the instrument must be regarded as invalid to pass the estate, because it does not express the will of a sound, disposing mind: American Seamen's Friend Soc. v. Hopper, 33 N. Y. 619, 640. A person whose mind is enfeebled by the drink disease or other cause may have sufficient testamentary capacity remaining, except as to the object concerning which he is under delusion, and that delusion may be fostered by a beneficiary to the extent of unduly influencing the direction of the testator's bounty; that is to say, the insane delusion may operate either against the natural and legitimate recipient of the testator's wealth, or in favor of a stranger exercising undue influence and encouraging the delusion to enhance that influence.

It is claimed by the contestants that they have established here that, at the date of the execution of the instruments, the mind of the testator was so impaired by habitual intemperance that he had not sufficient capacity to make any testamentary disposition; and that, furthermore, he was the victim of an insane delusion, and from these causes that he was peculiarly liable to be, and that he was, unduly influenced by the residuary legatee herein to make and execute the instruments here propounded.

### EFFECT OF INORDINATE USE OF INTOXICANTS.

The law books and medical treatises, and our own observation, confirm the fact that the inordinate use of intoxicating liquors does incapacitate men from making wills. It is known that it vitiates the blood, produces softening of

the brain, disorders the intellect, saps the vital forces, un-settles the healthy action of the body and mind, and destroys them both. Yet not in every case of the use of liquors do these results follow. Some men live on from year to year, drinking deeply, attending to their own affairs, and occasionally reach a ripe old age; others break soon. There is no rule by which to determine how much the system of any one man can endure. One man may be perceptibly affected by a single debauch, while another may remain sound in mind after many of them. A man temporarily overcome by a single debauch is, for the time being, of unsound mind, and has not testamentary capacity; so, a person to whom intoxication has become such a habit that his intellect is disordered and he has lost the rational control of his mental faculties, is of unsound mind. There are several kinds of drunkenness, and different kinds of drunkards. Balfour Browne, in his Medical Jurisprudence of Insanity, discusses drunkenness and its relations in this wise: "It is, it seems to us, necessary to distinguish several kinds of drunkenness, and the appreciation of the distinctions which exist between each of these will go far to make the relations of drunkards to the law and to their fellow citizens easily understood.

"First, there is the accidental drunkard. Any man may get drunk by accident. Children who know little of the effects of alcoholic liquor are apt, when these are first presented to them, to drink to excess, and it is only when the next morning's wakening comes, with a head full of wonderful aches instead of wonderful dreams, that the child learns that there is 'death in the pot.' Men may be led astray by the hilarity of some occasion, by the persuasion of friends, by physical feelings which prompt to relief by means of stimulants, and may become drunk. It has been remarked with truth that in a fit of ordinary drunkenness we have an epitome of an attack of mania. And it is to be remembered that during the continuance of the influence of this poison the man is, to all intents and purposes, insane. It is true that the attack is only temporary, but so are many incursions of mental disease; it is true that the cause of the aberration is one which the ordinary habit of the system will counteract and remove, but that remark is equally true of

many of the causes of insanity. Second, we have regular drunkards; they get drunk when it suits them; they are sober all day, and transact their business with sense and discretion, but they get drunk regularly at night; or it may be that the indulgence of this propensity comes at rarer intervals; still, there is a regularity to be noted in connection with these bouts. These are really sane drunkards. They have complete control over their passions, but they voluntarily throw the reins on its neck, they could resist temptation if they chose; they do resist temptation upon all occasions when indulgence would be inconvenient or dangerous, but on other occasions they do not care to resist. Third, there is a class of drinkers who scarcely deserve to be called drunkards, but who must, nevertheless be regarded by those who understand the true relations of this indulgence in liquors to pathology. Sir David Lindsay, in one of his poems, speaks of some men who were 'ever dying and never dead'; and this third class might be well spoken of as 'ever drinking and never drunk.' But these men who soak or tipple very frequently come under the cognizance of the medical psychologist, although their names may not appear on the books that are kept at the police cells. It is much to be feared that this class is on the increase. Many men boast of being 'seasoned casks,' meaning thereby that they can drink a great deal without showing the symptoms of intoxication; but the boast is vain, for even these men cannot escape the consequences of their acts, and the decadence of bodily and mental health is the too common result of their frequent indulgence. Fourth, we have habitual drunkards. As we have seen, in considering the psychology of drunkenness, a single gratification of the appetite for stimulants is followed by renewed craving for the same pleasures. The urgency of this craving increases, and as time goes on the measure of such indulgence becomes more excessive, and the interval between them more limited. This is not the place to discuss the large questions connected with the doctrine of the nature of volition and the freedom of the will; but no one can doubt that, whether the will is only a general name for the plus quantity in ruling motives or not, that motives have a very great deal to do with the exercise of

helping volition or controlling power. But what is the result of repeated indulgences upon the motives of the man? The habit to indulge becomes stronger, the bodily cravings grow in strength, and other motives lose their weight. In this way the moral sense of the individual becomes obscured, the self-respect and the self-restraint which depend so much upon this moral estimate of one's worth are no longer guiding principles of the life; the man has become the slave of an artificial appetite, and is no longer the free ruler of his own conduct; his organism rules over him, and the rule is not that of a constitutional monarch who is ruling in conformity with the laws of health, but the tyranny of a despot, who is ruling with the caprice of disease. Here, again, we find the real distinction between health and disease, and the basal principle of the legal distinction between sanity and insanity. We here pass from habitual drunkenness to dipsomania. This point was very well brought out by Dr. Crichton Browne in his evidence before a House of Commons Committee; the essential distinction, he said, appears to be that in habitual drunkenness the indulgence of the propensity is voluntary, and may be foregone, and in dipsomania it is not so. . . . . The points of distinction between dipsomania and drunkenness are several. I find that as a rule dipsomaniacs urge the internal craving as an excuse; they say, we cannot resist it. The drunkard, as a rule, urges some external excuse for his debauch; he says that he met a friend, or that it was his birthday; whereas, with the dipsomaniac it is the internal craving. The dipsomaniac is driven into the debauch by an impulse; the drunkard seeks the intoxicating effects. This seems to us to be not only a correct philosophical, but physiological distinction, and it serves as a good description, not only of drunkenness, but of that disease known as dipsomania'': Section 353.

Professor Ordronaux, in his "Judicial Aspects of Insanity" (page 382), treating of habitual drunkenness, remarks: "Another point deserving consideration is the fact that in habitual drunkards the sudden abstraction of the accustomed stimulant, particularly in weakened conditions of the body, leaves the brain within that degree of factitious stimulation which has become, through habit, a sine qua non

for the performance of any acts requiring the least mental effort. Between the stimulating periods produced by fresh cups a habitual drunkard is in a state of depression, or properly disease. He cannot do his best mentally, because there is no natural force to call upon, and his mental process and his will are as flaccid as his muscles. Can such a mind intelligently survey the field of varied property—of duty to others and to society, and, more difficult still, can it, after long imbrutement, respond to the dictates of natural affection toward either offspring, or kindred, or relatives, or resist the artful trammels of the designing and dishonest seducer who plays upon its weakness in order to lead it astray? Surely no occasion ever comes when the work of deception can be so successfully accomplished under the mask of friendship and sympathy, as when the mind of an habitual drunkard is worked upon in its waning moments upon earth by a cunning and interested party.''

It is claimed by contestants that they have established the substance of the issue involving insane delusion and undue influence, and that this was an occasion when the work of deception was successfully accomplished under the mask of friendship and sympathy by a cunning and interested party (the residuary legatee), who wrought upon the mind of an habitual drunkard (the testator) in its waning moments upon earth.

It has been said that the law indicates as two distinct grounds of opposition, unsoundness of mind and undue influence; and that while, when advanced in the same case, the consideration of each of them may overlap the other, yet as legal propositions they are to be kept distinct and apart. Considering the two issues together, it must be noted that, although mere weakness of intellect does not prove undue influence, yet it may be that, in such feeble state, with the mind weakened by sickness, dissipation or age, the testator more readily and easily becomes the victim of the improper influences of unprincipled and designing persons who see fit to practice upon him: Reynolds v. Root, 62 Barb. 250. It is claimed that the residuary legatee induced the deceased to separate from his wife and children, and to occupy the same apartments occupied by her at the lodging-house on the

corner of Fifth and Market streets, the house known as No. 1 Fifth street, and thereafter prevailed upon the deceased to continue such separation and occupation of said apartments with her, and that he was so situated at the times of the execution of the papers propounded, November-December, 1885. We first find deceased at this house, as related in his wife's testimony, in September, 1881, after he came from his sojourn in the country place of Mr. Strand, in Napa county; after he and his wife returned to town he came to his daughter's house one day and said he had hired a room at the corner of Fifth and Market streets—1 Fifth street—the house kept by Mrs. Bither, and thither the wife went a day or two after he had taken the room. For the first week deceased behaved very well and was quiet; then he became sick and was very ill; his illness was caused by liquor; he would go out and return intoxicated, and from that became so ill that his life was despaired of. During this time he was attended by Dr. Perrault, and it was there and then that his wife first met the residuary legatee—Mrs. Churchill—who was, it appears, in a manner managing the house, and with whom, the wife testifies, she had an interview upon one occasion in reference to the deceased, who at the time had been ill for three or four weeks. The wife testifies that she was in the kitchen making some beef tea for her husband when Mrs. Churchill came in and said to her: "You are a foolish woman to worry yourself and your children over your husband in this manner. I had a drunken husband once; I sent him home to his children; he soon died. You will only get curses, and he will die in the gutter. If I had him to deal with I would set a barrel of rotgut beside his bed, and let him drink himself to death."

After these remarks the wife said she wanted nothing more to say to her, and that she (the wife) was there for the purpose of taking care of her husband, and that she would do it to the best of her ability. The wife further testified that during this period Mrs. Churchill objected to going into the room where the deceased was lying—it being part of her household duty to attend to the lodgers' apartments—saying she was afraid to enter the room, as the deceased was crazy; she would hand the linen to the wife,

who told her that she would take care of the room herself. At this time there was another person than Mrs. Churchill employed in the house in a domestic capacity, one Mrs. Katie Donnelly, who, it is testified, was present at the kitchen interview. On November 24, 1881, husband and wife left this place and went to the home of their daughter, on Mason street. This ended the first sojourn of deceased at No. 1 Fifth street. They went to Mason street and continued there to reside until October, 1882. Two or three months after going to the daughter's, deceased left home one day and did not return, and after a hunt for him his wife found him at 1 Fifth street, where he was ill; she nursed him, and at his request they went back after two or three days to their daughter's. Mrs. Lura Churchill was at the house, 1 Fifth street, during this time; she was, according to her own testimony, the housekeeper at 1 Fifth street in 1881, and remained as such until January, 1883, when she left, and returned in May, 1884, when she became housekeeper again, and so acted until September 1, 1885, when the house changed proprietors; after which date she resided there until June 16, 1886, but had no position there during this period. During the times that deceased remained at this place this lady had opportunities for cultivating his acquaintance, which, it is claimed, she improved with a view to obtaining mastery over his mind, in order to secure for herself a large portion of his property. During the first stay of deceased at 1 Fifth street she professed a great aversion to coming in contact with him or entering his room, although it was within the scope of her duty to do so, in managing the house and looking after the rooms; but upon the occasions subsequently that he visited and lodged at the house this aversion was apparently changed into a friendly concern for him, and to so great an extent that she surrendered her own apartment to his use, although she denies that she ever shared it with him meretriciously (Judge's Notes, page 184). She explains how he happened to occupy her room in the first place, that he had come in from the street to see Mrs. Bither, and he was taken with a congestive chill; Mrs. Bither was not in the house at the time; he was taken very suddenly, and so Mrs. Churchill allowed him

to occupy her apartment, room No. 2, while she occupied room No. 19, with Miss Baty, who, it seems, was for a time engaged in a capacity similar to that of Mrs. Churchill (Judge's Notes, page 184). Miss Baty testifies that the deceased came frequently, from March, 1884, to the house 1 Fifth street; that he was out and in nearly every day; that he called to see Mrs. Bither, for whom she was then acting as housekeeper. She says that the deceased was ill there several times, very ill; the first time, according to her knowledge, was in the fall of 1885, for a period of two or three weeks. At that time Dr. Beverly Cole was called, and came twice; subsequently the deceased had a very serious attack of sickness, in 1885, when Dr. Charles Rowell was called. Mrs. Churchill nursed and attended him at his request, and Miss Baty says that she assisted her and did a great deal for him; she saw him all the time in 1885 and 1886, when he was sick, and conversed with him every day. In 1885, at the time of the first attack, deceased occupied room 2, and at the time of his last illness he occupied room 4, when, as Mrs. Churchill and Miss Baty testify, they occupied together room 19. This was Miss Baty's room, but upon Mrs. Churchill yielding her own apartment to the deceased, under the circumstances narrated, she accepted a share of the room of Miss Baty, who states that Mrs. Churchill never occupied the same room with the deceased, except when he was very ill and she had to take care of him at night, but she never occupied the same bed with him. This lady never saw anything improper between them, although she claims that she would have observed it if anything of the kind had occurred, but that Mrs. Churchill was nothing more than a nurse taking care of a sick man (Judge's Notes, page 178). It is claimed on the part of proponents that, thus situated, Mrs. Churchill did but an act of kindness for the deceased when he was sick and needed nursing, and that there is not an atom of evidence that there was the least taint upon the morality of her relations to or with him, and that, so far as the record shows, she is perfectly pure, and that there is not a particle of proof that she ever used any influence upon the testator at any time, and most certainly not at the time of the making of the will and codicil, to keep him separate from his

wife and family, or to exclude them from his presence or to divert the disposition of his property; and that the evidence shows that he was kindly cared for and nursed at No. 1 Fifth street when he was deserted and abandoned by his own wife and family, and that the residuary legatee urged his return home and always spoke kindly of his family, striving to reconcile him to them, but that he would not go to those who had thrust him out, and that therefore he was harbored in the house of Mrs. Bither, who had a sisterly fondness for him, and who felt it to be her duty to receive him and accord him attention when he was ailing, and that it was in consonance with Mrs. Bither's desire that Mrs. Churchill devoted herself to nursing the deceased when he was ill. On the other hand, it is contended by the contestants that the evidence shows that the residuary legatee and the deceased sustained other than lawful mutual relations; that it was a case of man and mistress rather than of patient and nurse, and that all the circumstances of the conduct of the residuary legatee make irresistible the inference of undue influence and sustain the charge that she used her proximity and position toward him to foster and fasten insane delusions in his mind with reference to his wife and family, and that of this influence and these delusions the will was the offspring. If this contention be borne out by the evidence, much of the argument of the proponents as to the character and extent of importunity that will fall short of undue influence goes for naught, because there is a distinction between the influence of a lawful relation and the influence of an unlawful relation.

The will of a man who has testamentary capacity cannot be avoided because it is unaccountably contrary to the common sense of the country. His will, if not contrary to law, stands for the law of descent of his property, whether his reasons for it be good or bad, if indeed they be his own, uninfluenced by an unlawful influence from others. Lawful influence, such as that arising from legitimate family and social relations, must be allowed to produce its natural results, even in influencing last wills. However great the influence thus generated may be, it has no taint of unlawfulness in it, and there can be no presumption of its actual un-

lawful exercise merely from the facts that it is known to have existed, and that it has manifestly operated on the testator's mind as a reason for his testamentary dispositions. Such influences are naturally very unequal and naturally productive of inequalities in testamentary dispositions; and as they are also lawful in general, and the law cannot criticise and measure them so as to attribute to them their proper effect, no will can be condemned because the existence of such an influence is proved, and because the will contains in itself proof of its effect. It is only when such influence is unduly exerted over the very act of devising, so as to prevent the will from being truly the act of the testator, that the law condemns it as a vicious element of the testamentary act; so the law always speaks of the natural influence arising out of legitimate relations. But we should do violence to the morality of the law, and therefore to the law itself, if we should apply this rule to unlawful relations; if we should thereby make them both equal in this regard at least, which is contrary to their very nature. If the law always suspects and inexorably condemns undue influence, and presumes it from the nature of the transaction, in the legitimate relations of attorney, guardian and trustee, where such persons seem to go beyond their legitimate functions and work for their own advantage, how much more ought it to deal sternly with unlawful relations, where they are, in their nature, relations of influence over the kind of act that is under investigation? In their legitimate operation those positions of influence are respected; but, where apparently used to obtain selfish advantages, they are regarded with deep suspicion; and it would be strange if unlawful relations should be more favorably regarded.

The voice of the law on this general subject is distinct and emphatic, transmitted through many generations and embodied in many Latin maxims, all of which may be summed up in one sentence: No one shall derive any profit through the law by the influence of an unlawful action or relation. The ordinary influence of a lawful relation must be lawful, even where it affects testamentary dispositions; for this is its natural tendency. The natural and ordinary influence of an unlawful relation must be unlawful, in so

far as it affects testamentary dispositions favorably to the unlawful relations and unfavorably to the lawful heirs. Ordinary influence may be inferred in both cases, where the nature of the will seems to imply it; but in the former it is right, because the influence is lawful; and in the latter it may be condemned, together with its effects, because the relation is unlawful. There can be no doubt that a long-continued relation of meretricious intercourse is a relation of great mutual influence of each over the mind and person and property of the other. History abounds with proofs of it, and it requires no very long life or very close observation of persons around us in order to reveal the fact. If there was such a relation between the testator and the residuary legatee at the time of the making of the will, it would render inapplicable the cases cited for proponents, and go far to establish the case of contestants: Dean et ux. v. Negley et al., 41 Pa. 316, 80 Am. Dec. 620.

A charge that the parties sustained toward each other illicit relations ought not, as was said in Wallace v. Harris, 32 Mich. 393, to be lightly hazarded, and when once made it should be substantiated by very cogent evidence; unless sustained by clear and satisfactory proof, it should be dismissed. There can be no doubt that it would be pertinent to show the existence of such relation as a fact to prove the prevalence of undue influence. But the proof may fall short of establishing meretricious intercourse, and yet show anomalous conduct between the parties as to justify the inference that, if they were not carnally intimate, they were upon such close terms of acquaintanceship as rarely obtains between nurse and patient. Reputable persons have testified to scenes and incidents and circumstances that support the theory of unlawful relations, and while this is denied and disputed by the witnesses for the proponents, yet it is clear upon the whole record that there was on the part of deceased a fatuous fondness for the residuary legatee and a simulated reciprocation, which strongly tend to establish contestants' charge that she was, during the long period of his ultimate illness, as well as for some time prior thereto, something nearer and dearer far than a mere nurse and attendant. The residuary legatee is a woman of masculine

vigor of understanding, of a native shrewdness of character
and enriched by an extensive experience in worldly affairs,
and it is by no means inconceivable that she exercised a po-
tent influence over the deceased, and that she practiced for
her own profit upon the weak mind of this old man, de-
mented by drink and made incapable by his condition of
overcoming the effect of her crafty designs and artificial
allurements; and that this influence covered an extended
period before and after and including the time, and reaching
to the act of making the will and codicil; and, if this in-
fluence is shown to have once existed, by whatsoever means
produced or acquired—whenever the mind of one person is
reduced to a state of vassalage to that of another, and a gift
is shown to have been made by the weaker party to the
stronger—there the burden of proof will be shifted, the gift
will become presumptively void, and the onus of upholding
its fairness and validity will rest upon the shoulders of the
recipient of the gift. This rule is firmly established in re-
gard to gifts made by deed, and the same principle should
hold in regard to wills, and so courts have declared: Gay v.
Gillilan, 92 Mo. 250, 1 Am. St. Rep. 712, 5 S. W. 11.

In connection with the issue of undue influence must now
be noticed the insane delusion imputed to deceased, and, as
thereto related, the insanity proceedings taken against him.
It is said by counsel for proponents that there was no de-
lusion whatever in the mind of deceased; that so far as his
testamentary disposition adverse to his wife and family was
concerned, it was based upon fact and not upon fancy; and
that his declaration that he made no provision in his will
for his wife or for his children, for the reason that the con-
duct of his wife and children toward him since the time of
the deed of separation (March 30, 1881) did not commend
them, nor either of them, to his consideration, was founded
upon the truth. What was this conduct? What had they
done to alienate them from that consideration which this
language implies would have been accorded if the conduct
of the one had not been unwifely, and of the others unfilial?
Was there any foundation for this disherison, or was it the
product of delusion sedulously nurtured by the residuary
legatee, whom he describes as having been to him in all his

sickness "a true and tender friend and nurse"? The counsel for proponents declares that the testator was moved to this declaration because a great and unpardonable wrong had been done him by his family; that his spouse had acted as an unloving wife, and his sons and daughters as ungrateful children; that they were constantly harassing him; that he was laboring under no delusion; they were endeavoring to incarcerate him as a lunatic, and that the language of the will shows that the testator fully understood the situation, and had good reasons for what he did. In the same connection counsel for contestants asks the court to compare the will with the complaint in the divorce case between the deceased and his wife, and claims that they are both the product of the same mind; this is the document published as an advertisement in the "Evening Post" newspaper of September 13, 1884, and for the purposes of reference is appended, as printed, to this opinion. This document counsel for contestants denounces as the emanation of the brain of Brumagim, one of the proponents, and it is urged that the authorship is a fact and circumstance in this case that goes to demonstrate that this controversy is the result of a vile conspiracy concocted by the said Brumagim, who has not appeared on the witness-stand because, it is argued by counsel for contestants, he did not dare to come in where his testimony would expose his own infamy in connection with this case. It is claimed that this is a most pregnant circumstance against proponents. Mr. Brumagim seems to have been attorney of record for the deceased in the divorce case, and is one of the executors here, and his counsel say that there is no justification for the assault upon him, forasmuch as he has done nothing in the matter except what was devolved upon him as duty.

The composition of this complaint, so far as its peculiar phraseology goes, may be attributed to the attorney who signed it; while the publication in the periodical and its circulation broadcast may have been solely the act of the plaintiff, without being aided and abetted by his attorney in so unusual a mode of advertising a client's domestic history and marital miseries. This complaint purports to contain a recital of the ultimate facts constituting the cruelty

which was the cause of action, and begins by charging the wife defendant with endeavoring, by false statements in her petition, filed in March, 1881, to have her husband adjudged insane and incompetent, thereby to injure him and get possession of his property and estate; and that she only dismissed such petition when he deeded one-half of his property to her by an agreement, a copy of which is subjoined to the complaint. The actual language of the petition of March 3, 1881, is, in this regard, as follows: "That said Robert J. Tiffany is of unsound mind and is mentally incompetent to manage his property, and, as your petitioner believes, has been thus incompetent for more than six months last past. That he is and for a considerable time past has been squandering, wasting and mismanaging his estate; that, as your petitioner is informed and believes, he is, by reason of his mental incompetency, frequently taken advantage of by impecunious and irresponsible persons, and induced to loan them money without any security for or reasonable prospect of repayment; and that he is liable at any time to make conveyances of real estate and transfers of his personal property upon inadequate considerations, or upon no consideration at all. That the mental condition of said Robert J. Tiffany is not amending, and, as your petitioner believes, is likely to grow worse and still further to unfit him for the management of his property; that unless a guardian be appointed there is great and imminent danger that all the personal property of said estate will be wasted and dissipated, and that the means of maintenance of said Robert J. Tiffany and his family will be destroyed or at least largely reduced. That by reason of his mental condition the said Robert J. Tiffany is violent, imprudent and erratic in his conduct, and is incapable of taking care of himself, and is exposed to injury at his own hands and from others."

The complaint further charges the wife with instigating the insanity inquisition of February, 1883, and the subsequent and consequent guardianship proceedings in which Mr. Eastland was appointed guardian, all of which proceedings, it is alleged, were secretly kept from him, and were willfully and maliciously promoted by his wife, and that the letters were willfully and surreptitiously obtained for the sole pur-

pose of injuring plaintiff and getting possession and control of his property. In connection with this accusation by the husband against the wife, it appears from the official record of insane commitments (volume 6, folio 159, Superior Court, Department 10) that upon the sworn complaint of one M. A. Sweet, made on the third day of February, 1883, the deceased was brought before F. M. Clough, judge of the superior court, who, after having heard the testimony of Dr. James J. Birge and Mrs. Tiffany, and upon the certificate of Drs. L. J. Henry and I. S. Titus, graduates in medicine, and being satisfied that the said Robert J. Tiffany was insane and dangerous to be at large, and of the truth of the certificate of the doctors, which, among other things, declared that he had been more or less affected during the previous six years, ordered him to be taken and placed in an insane asylum at Stockton, and charged the sheriff with the execution of the order. In the matter of the letters of guardianship, the application for which, it is said, was secretly kept from the plaintiff and surreptitiously obtained, it appears that a petition was filed on February 9, 1883, by McClure & Dwinelle, attorneys for Phoebe J. Tiffany, in which she alleged, among other things: ''That the said Robert J. Tiffany is insane, by reason of which insanity he is mentally incompetent to manage his property, whereby it becomes necessary that some suitable person should be appointed guardian of his person and estate; and it is the desire of your petitioner and of his said children that your petitioner be appointed guardian of his person and estate. And your petitioner further shows that on the third day of February, 1883, the said Robert J. Tiffany, having had a legal examination by and before a board of physicians duly and legally constituted to examine him as to his sanity, was by it pronounced to be insane, whereupon, and on the day and year aforesaid, he was by one of the judges of this court committed to the authorities of the State Insane Asylum at Stockton, and under such commitment he was conveyed and is now in charge of the authorities of said asylum at Stockton; and your petitioner further shows that she is informed by Dr. Shurtleff, the principal resident physician at said asylum, that in his opinion the said Robert J. Tiffany is hopelessly insane, and that he will probably never

recover his reason, and that your petitioner believes he will be unable to attend this court on the hearing of this petition. Wherefore your petitioner prays that she, or some other competent person, be by this court appointed guardian of the person and estate of said Robert J. Tiffany, with the powers and duties in such cases by law made and provided; that a time and place be appointed for the hearing of this petition, and that notice of the hearing of the same be served upon the said Robert J. Tiffany at least five days before the time that shall be appointed for such hearing.''

Upon this petition it appears that on the same day an order was made setting the nineteenth day of February, 1883, for the hearing of said petition, and ordering notice to be given to the said Robert J. Tiffany of the time and place of hearing, at least five days before the time appointed, by serving upon him personally a copy of the citation addressed to him. In accordance with this order it appears from the return of the Sheriff of San Joaquin County that on the twelfth day of February, 1883, he personally served such citation upon said Tiffany. It further appears that it was filed in this court upon the nineteenth day of February, 1883, the return day named in said order, a paper indorsed ''Certificate of Dr. Shurtleff,'' couched in these words:

''Insane Asylum of the State of California,
''Stockton, Cal., February 15, 1883.

''I hereby certify that Robert J. Tiffany is now under my care and treatment for insanity, he having been regularly committed to the State Insane Asylum at Stockton on the 3rd instant by Judge F. M. Clough, of San Francisco; that he is of unsound mind and physically feeble; and that, in my opinion, he is not able to attend Court in San Francisco on Monday, the 19th instant, and will not then be able, without injury to his health generally, and greatly aggravating his mental disorder.

''G. A. SHURTLEFF, M. D.,
''Med. Supt.''

Subsequently, on April 2, 1883, an order was made which recited that ''the petition of Phoebe Jane Tiffany for the appointment of herself or some other person as the guardian

of the person and estate of the said Robert J. Tiffany coming on regularly to be heard, and also her further petition that Joseph G. Eastland, of said city and county, be appointed such guardian, being also heard, and the matter submitted for decision, and it appearing to the court and to the judge that the said Tiffany is an insane person, and that a guardian of his person and estate should be appointed, and that the said Eastland is a competent and proper person to be appointed such guardian, it is ordered that the said Eastland be and he is appointed guardian of the person and estate of said Tiffany, and that letters of guardianship be issued to him'' upon his giving the proper bond. It will appear from this comparison that the allegations of the complaint are somewhat at variance with the probate records of the proceedings. The complaint proceeds further to set forth the recovery of the health of the plaintiff and his judicial restoration to capacity upon the 31st of October, 1883, and the discharge of the guardian upon the delivery of the property of his ward to him. The complaint goes on to relate the proceedings in Department No. 8, beginning with the petition filed on the 29th of December, 1883, which, it is charged, was instigated by the wife for reasons similar to those which prompted the preceding proceedings and which resulted in a trial by jury and a verdict on the 12th of March, 1884, that plaintiff was not insane. Then the complaint proceeds to recount numerous charges of false rumors spread abroad by his wife and children, cruelly done for the purpose of annoying and injuring him before the business community, and to cast disgrace upon his life and character, and to get possession of his property. And the complaint further charges defendant with having caused the plaintiff to be confined in the inebriate asylum, and to be hounding the plaintiff with her bitter persecutions, and to have, by her envenomed tongue, caused him great mental anguish and suffering, and that her wicked, cruel treatment toward him, and her conduct had been so utterly at variance with the principles of common decency and kindness that it caused his life to be one of perpetual social sorrow; and so bitterly persecuting had been her conduct and personal treatment toward him that she made it utterly intolerable for him to live with

her in the marital relations, and that her ceaseless aim had not been his social happiness and their mutual enjoyment, but one of bitter persecution and "general cussedness" in her conduct toward him; that she had blighted his life in her fiendish persecution, so that it would be utterly impossible for him to ever have that relation of social, moral and intellectual communication with her that should exist between man and wife. The summing up of the ills visited upon him in the phrase "general cussedness" is a unique contribution to the forms of pleading and an addition to the language of the law that hereafter may aid the draftsman of divorce complaints.

It is asserted by counsel for proponents that the deceased never was actually confined in an insane asylum, but after the commitment sojourned at a hotel in Stockton; and it is asked, if he were insane would that have been allowed? It seems from the testimony that he stopped at the Yosemite House in Stockton by permission of the authorities of the asylum and in charge of a nurse from that institution, and that he was taken care of there by his wife. The certificate of Dr. Shurtleff, the medical superintendent, hereinabove inserted, is of itself a sufficient statement of his condition at that time. All of the proceedings in the insanity inquisition and the application for guardianship were regular, and did not show that the charges in the complaint as to secrecy or surreptitious conduct were true. It appears rather that they were based upon well-grounded apprehensions that the conduct of the deceased was calculated to impair the substance of his estate, and to produce injury to himself and to those dependent upon him. Until he became a hard and habitual drinker, and in many respects a sot, his relations with his wife and family were always loving and affectionate, and it is testified that nothing ever took place between the husband and children to alienate his affections from them. It was after that time when the change in his habits and character became apparent, that when they remonstrated with him for his behavior and endeavored to reclaim him from his debasing courses, that the difficulties occurred. There is no credible evidence here that his wife was lacking in conjugal affection; there is no evidence whatever that she was an un-

faithful spouse, although there is testimony that the mind of the testator was infected with the delusion that she was a party to a low intrigue with a hackman, and that she submitted herself to an embrace with one of the witnesses for the contestants over the corpse of her husband immediately after his decease (Judge's Notes, page 142, line 25 to 32; see page 145, lines 17 to 22). The whole course of her conduct, as revealed by the evidence, and her appearance and demeanor on the stand command credence in the claim that Mrs. Phoebe J. Tiffany was a true wife and a good mother.

It may be, as counsel for proponents argues, that while upon the stand she was acting for effect, but it is hard to believe that this is true when we compare her testimony with the record of her years of tribulation caused by her husband's erratic conduct and the patience with which she endured the trials consequent thereupon. Her conduct was characterized by that charity which suffers long and is kind; which does not behave unseemly, and is not easily provoked; which bears and believes, and hopes and endures all things for the sake of its object, which in this case was the reclamation of her erring husband. It does not seem probable that this woman has been acting a part as a witness in order to delude the court into a judgment contrary to the truth. It is scarcely credible that this wife of forty years has become in her old age so clever an amateur actress that she can make falsehood appear fact without detection. Notwithstanding the charges in the divorce complaint, the court does not believe that her ceaseless aim was to destroy her husband's social happiness and their mutual enjoyment, and that her conduct toward him was characterized by bitter persecutions and "general cussedness"; or that she had blighted his life in her fiendish persecution; or that she had an "envenomed tongue"; or that her conduct toward him was so utterly at variance with the principles of common decency and kindness that it caused his life to be one of perpetual social sorrow. It would seem rather that, owing to his unfortunate infirmity, the contrary of this statement was the case. Her conduct was marked by tender care and solicitude for her husband, notwithstanding the charges so painfully elaborated in the bill of complaint advertised in the "Post" newspaper.

There is nothing inconsistent with this in the filing of the petitions to place her husband under restraint on account of his condition. It is the part of a good wife (when moral means have been unavailing) in the last recourse to resort to the law for the protection of the husband and of the property which is in danger of destruction through his conduct. Her conduct in withdrawing the first application, and in the negotiations which led to the making of the agreement of partition of property and separation, which was done under advice of counsel, should not prejudice her position in this controversy.

Tiffany's mental condition in 1881 was not so fully developed as four years later, although his aberrations were so apparent as to cause apprehension in the minds of those who were most observant of his conduct, and it was the part of sheer prudence to place beyond the reach of wreck some portion of his estate. The circumstances of the Estate of Noah, decided by this court and affirmed by the supreme court (73 Cal. 583, 2 Am. St. Rep. 829, 15 Pac. 287), differed very materially from those surrounding this case, and cannot be considered as affecting the decision of the issues here presented. When the second application for letters of guardianship was made, the deceased was in Stockton, at the Yosemite Hotel, in care of the nurse provided by the superintendent of the asylum, and that application was made in accordance with his request by his wife, as she testifies. Apart from the official certificate of the service of the citation upon Mr. Tiffany, which is conclusive as contradicting the statement that the proceedings against him were secretly and stealthily conducted, his wife testifies that she was present in their parlor at the Yosemite House when the citation was served. She watched him and cared for him, and subsequently in the country at Haywards, and at Oakland and elsewhere. When he was judicially restored to capacity, November 13, 1883, she made no opposition, and says that the proceeding was taken at her request, being in the line of her efforts to reclaim him by considerate and indulgent treatment. The application which was tried before a jury in Department 8 was not made at the request of the wife, according to her testimony, but by the desire of the children; and,

curiously enough, these parties mingled amicably every day, husband and wife and children going to court together. Notwithstanding the nature of the proceeding, there was no apparent acrimony in the family circle at that time. The proceedings were prosecuted and resisted without any bitterness of sentiment, and during the intervals of recess husband and wife and children discussed the situation in a friendly manner. A few days after the verdict the wife testifies that she saw her husband at the Home of the Inebriates, where he remained for about a month, but she had nothing to do with his confinement in that institution at any time.

### THE FIFTH STREET ENVIRONMENT.

Concerning the circumstances which environed deceased at number 1 Fifth street, it is said on behalf of proponents that his family did not visit him while he was lying sick, although they were not barred out; that the latch was always down; that no obstacle was placed in the way of free communication between him and his wife and children; that so far from preventing the members of his family from seeing him, or keeping him from returning to them, the residuary legatee was always trying to induce him to return, trying to reconcile him to his family, but he said that he could not trust them (Judge's Notes, page 186); and the witness Ann Baty, who appears to have been assisting the residuary legatee in her attendance upon the deceased during his last illness, testifies that she never saw his wife before that time; that she saw his son William in the fall of 1885 in the house twice; that on the first visit no one was in the room but the deceased, herself and the son, and that on the second visit the daughter accompanied her brother; then only the deceased, the son and the daughter, the residuary legatee and the witness were in the room; that the deceased did not wish to speak to his daughter, but Mrs. Churchill said, "Mr. Tiffany, your daughter is here," and he said "Emma, since you have come, I will speak to you; how is Cecil [that was her child, his little granddaughter]? I should like to see her." Mrs. McGregor said she would bring the child next time; then she said, "Father, why don't you come up to the house? We have a nice room for you there." He

said he would not trust himself to them any more, as he was afraid they would poison him. This witness said she had heard the deceased speak of the treatment of him by his family. She testified that he said his wife had a very violent temper, that at times she had "bit and scratched him in the face until the blood ran down to his collar." This witness also testified that the deceased told her that his son Willie once jumped on his back when he (the son) tried to throw him down. The witness said that she had heard the deceased repeat "time and time again" that his wife had bitten him in the arm, and he told her shortly after he came to 1 Fifth street, in 1884, about his wife scratching and biting him. Miss Baty further testified that the physician, Dr. Rowell, told them not to leave the room when Mr. Tiffany's family came, as he, the doctor, would feel responsible on account of the threats made by them that they "would shut his wind of," and also Mrs. Churchill's, or that he should leave the house. It was in the fall of 1885, she testified, that Dr. Rowell told her about the threats of Mr. Tiffany's family, and told her and Mrs. Churchill not to leave him alone with the members of his family in his room (Judge's Notes, pages 179 to 182).

### TESTIMONY NOT EASILY RECONCILABLE.

If this witness speaks the truth, her testimony is not easily reconcilable with the claim that the family had access to the deceased at all times, and that they were always welcome, because there was certainly some restraint imposed by the restrictions which were imputed to the physician, Dr. Rowell. It does seem that when the members of the family visited the deceased before and after the making of the will, with the expectation of having confidential and private conversations with him, the residuary legatee or the witness Miss Baty remained in the room, so that no such intercourse took place without it being exposed to them. It would appear that the wife of deceased and his daughter were always anxious, ready and willing to go and nurse him during his illness, and to reside with him, or have him reside with them, on condition that he would sever his connection with the residuary legatee, and of this he was fully aware, but he still

refused to break the association with the residuary legatee. On many, if not on all, of the occasions when the friends of the deceased called on him, the residuary legatee or the witness Miss Baty made it a practice of remaining in the room during the whole time of the visit, and overhearing all that passed - between them: 41 Pa. 314, 315. Why didn't his family visit him at 1 Fifth street? The contestants respond to this question by citing the circumstances of his sojourn at that house and the repellant influences there meeting them. There was certainly some impediment in the way of those who were supposed to be connected with his family in obtaining access to him. (See Judge's Notes, page 69, testimony of Alfred M. Learned, who, upon his first visit, was refused admission by Mrs. Churchill.) With regard to the statements in the testimony of Miss Baty credited to the deceased, there is not a scintilla of evidence supporting such act of physical cruelty on the part of his wife or his relatives; and, if he made such statements, they must have been the product of an insane delusion which led him to regard as certain truths, and actually believe in the existence, on the part of his wife and of his relatives, of conduct and intentions substantially such as he imputed to them. I am perfectly satisfied that there was no foundation in fact for the gross imputations upon his wife or the charge against his relatives, all or any of them, of a design upon his life, or an intention to do him any bodily injury; and that the idea of a conspiracy upon their part to injure him in such manner was purely imaginative, if it at all existed. If a person persistently believes supposed facts which have no existence except in his perverted imagination, and against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence, he is, so far as they are concerned, under a morbid delusion; and delusion in that sense is insanity. Such a person is essentially mad or insane on those subjects, though on other subjects he may reason, act and speak like a sensible man. If the deceased in the present case was unconsciously laboring under a delusion, as thus defined, in respect to his wife and his family connections, who would naturally have been the objects of his testamentary bounty, when he executed his will or when he dictated it (if

he did dictate it), and the court can see that its dispository provisions were or might have been caused or affected by the delusion, the instrument is not his will, and cannot be supported as such in a court of justice. The conduct and designs which he imputed to his wife and relations were such as, upon the assumption of their existence, should have justly excluded them from all share in the succession to his estate: 33 N. Y. 624, 625.

### NOT A PARTICLE OF PROOF.

There is not a particle of proof in this case that the wife of deceased was ever guilty of the act of which she was accused by Mr. Tiffany, according to the testimony of Miss Baty. I am bound to believe that this is either a figment of his diseased imagination, or a fabrication by her. The wife testifies that she went to this house No. 1 Fifth street, to see her husband, with her son in law, Mr. McGregor. She went to the door and knocked; her son in law was just behind her. Mrs. Churchill came to the door. When she saw who it was she pushed it to in her face, but the wife pushed past and entered the room. The husband was lying on a lounge much too short for a man of his height, with his head toward the door. The wife went up to him and said, "Papa, how are you, papa? I heard you were ill." He put out his arms and he said, "Oh, my dear mamma, I am so glad to see you." The wife said, "I know you are," and she kissed him; he took her hand, and she took her glove off, and he took her hand and he said, "Sit down. I am so glad to see you; I knew you would come to see your old papa when you knew he was sick, anywhere, even into this house, to this room." Then she sat down, and they talked of the loved ones that had passed away, and she talked to him about the dead and those that were remaining and during this time Mrs. Churchill got up twice and gave him whisky; the second time the wife said, "Oh, don't give him that." Mrs. Churchill took notice of the remark, and sat down again. Then the deceased looked around the room and seemed to recognize the residuary legatee and the wife, and said, "Oh, Mrs. Churchill, this is mamma, my wife." Mrs. Churchill got up off her chair and said, "There is no use of your introducing the lady

to me; I know her well, and when she knew me I was no prostitute." The wife turned and looked at her. Mrs. Churchill sat down again, and presently got up and gave him some more whisky, and then took her seat. · The husband still held the wife's hand, and kissed it occasionally. She went on talking to him about the family, and after awhile Mrs. Churchill got up and said, "Now, Robert, I will not stand this; that woman cannot come to my rooms again; you have got to choose this very night between her and me; now, right now; she shall not come; and you, too, McGregor, you shall not come." The wife then said to her husband, "Will you not come home? This is no place for you; you will never get well here; I will go with you to any hotel, and I will take rooms in this house if you will let me take care of you, papa; I will nurse you back again to health, as I have so many times before." And the husband said, "Mamma, this is no place for you; go home to the children; I will be out in a day or two." He then kissed her hand, and the wife said, "Papa, let me take care of you; come away from this place; I will take care of you." He said, "I will be out in a day or two." The husband took the wife's hand and kissed it, and said, "Mamma, you know if I was living with you and my wife should come it would not be pleasant; go home, I will see you in a day or so." The wife said, "Papa, I am your wife; it is my place to be beside you; I will take care of you." He said, "I will be well in a day or two; I will come and see you and the children." The wife bade him goodnight and said, "Papa, I will go away." It was then nearly 10 o'clock at night. He kissed her, and she said to him, "Papa, shall I come to see you?" He said, "Yes, mamma." The wife said, "Do you want to see me?" He said, "Yes, mamma, come and see me as often as you can; I will be out in a day or two," and then she went away. Both Mrs. Churchill and Miss Baty in their testimony, who were present at the time, contradict this statement (Judge's Notes, page 185); but there is at least enough in the whole statement to show that Tiffany had not lost affection for his wife. His daughter Emma visited him altogether six or seven times. When she would go there he would put his arms around her and kiss her, and ask how "dear mamma" was and ask after

his daughter's husband; he was under the influence of liquor every time; the daughter brought him some wine jelly once, but did not bring him anything else; she last visited the house the day before Thanksgiving, 1885, but did not see her father there that time; she saw him two days before, and he was so ill he could not walk; he was greatly emaciated, and Mrs. Churchill and Miss Baty were there. She went twice to the theater with her father in the spring of 1886, the second time the 20th of March; she went with her child to see "Buffalo Bill" on Saturday afternoon; she met her father at the theater door; that day at the theater he took her by the hand and said, "Mrs. Churchill cannot turn me against you; I have made my will and provided for you."

### BRUMAGIM AT 1 FIFTH STREET.

In April, 1886, was the first time she saw Brumagim at No. 1 Fifth street; Mrs. Churchill followed him out; he only remained a few minutes; she never saw her father alone in that place; she made a visit there in May, 1886; her father said he wanted her to speak to Mrs. Churchill and Mrs. Churchill to speak to her, and they did so; Mrs. Churchill said, "Robert, Mrs. McGregor is the only one of the family who understands this case." On Sunday, the 23d of May, 1886, the daughter being on a visit to the father, he turned to Mrs. Churchill and asked her to leave the room, as he had occasion to speak to his daughter; she did not leave the room, nor make answer. When the daughter visited No. 1 Fifth street, Mrs. Churchill and Miss Baty, one or both, were always there; sometimes Mr. Brumagim was there, sometimes a Mr. Pat Lynch; one time the daughter at her own home heard her father say he was going to marry Mrs. Churchill at Pioneer Hall, and would drive the family there in a coach and four (Judge's Notes, pages 9 to 13). A witness Mrs. Catherine Donnelly, testifies that she was employed at No. 1 Fifth street by Mrs. Bither as chambermaid; that Mrs. Churchill at that time was also a chambermaid; that there was a kitchen on the second floor, and she saw the wife of deceased there when Mrs. Churchill was in the kitchen, and the wife was making beef tea. Mrs. Churchill said to her, "If she was his wife she would buy him a barrel of rotgut,

and let him drink himself to death; that he would go to the gutter, anyhow.'' On one occasion she testifies that she heard the deceased say to Mrs. Churchill, ''Don't call me Mr. Robert; call me your dear Robert,'' and kissed her. On another occasion she had conversation with Mrs. Churchill about the deceased, and Mrs. Churchill had said that his wife had thrown him out, and she had picked him out of the gutter; and his wife was only a common whore, and that he had caught her in a house of assignation with a hackman. This last conversation spoken of was in March, 1885. Again she met her on Kearny street and had a conversation with her, and the witness said to Mrs. Churchill, ''I see you have bought a lot; how did you get the money so quick?'' to which inquiry the response was, ''I have made a great deal of money in stocks, and have bought the lot and paid for it.'' Once again, on Fifth street, Mrs. Churchill said, ''I have had a handsome Christmas present, a pair of blankets, two oil paintings and a diamond ring, which Mr. Tiffany gave me.'' This was in April or May, 1886 (Judge's Notes, pages 16, and 17). All of these statements are denied by Mrs. Churchill (Judge's Notes, page 184). The deceased went to room at 628 Sutter street, in the house of Mrs. Kate E. Learned, in December, 1884, and was there about a year and a half; he came with a Mr. Rapp; he stayed in the first room six or seven months, then he took a small room for eight or nine months; he went away five or six months after he came, and then returned; his attorney, Joseph M. Wood, paid for three or four months: Mrs. Churchill paid one month, the rest of the time he paid himself; he did not stay there half the time in the first period referred to; during the second period he was absent for a month at a time; Mrs. Churchill had a key to his room, also of his trunk; Mr. Tiffany introduced Mrs. Churchill to Mrs. Learned; he said that Mrs. Churchill was a dear friend of his; she lived at 1 Fifth street, and did the chamber work for Mrs. Bither; Mrs. Churchill may have remained there fifteen or twenty minutes at the time in his room; she was introduced to the witness two or three months after Mr. Tiffany first came, and the witness saw her there afterward during the first period of his stay at the house; she would come sometimes two, or three, or four times a

month; she would be accompanied by him, and remain a half hour at a time, and he would go out with her; she would always be at his room. The witness learned from Mr. Tiffany that he went from her house to 504 Sutter street, to a Mrs. Meyers; he subsequently returned to the house of Mrs. Learned to see if he could get a room, and said, "I was sorry I left your house, but Mrs. Churchill desired it, as she and Mrs. Meyers were friends, but now they have quarreled and I now want to come back." He and the witness had a conversation about Mrs. Churchill; he said, "What is the rent of the front suite of rooms, and what will you board me and Mrs. Churchill for? I am going to get a divorce, and am going to marry Mrs. Churchill." The witness had a great many conversations with him upon that topic. She had also a conversation with Mrs. Churchill in the latter part of 1885. Mrs. Churchill came to her house and said she wanted his things. The witness said she was glad, as she did not want him in her house; Mrs. Churchill said she had taken a room for him in O'Farrell street, that his family had tried to put him in the insane asylum, that she would take care of him, that his family were willing that she should take care of him, but were not willing to do anything for him; that she would show them she should take care of him, and would do so to spite his wife. Mrs. Churchill took his trunk and other things belonging to him. The witness said Mr. Tiffany would very seldom come in before 12 or 1 o'clock at night; he was always intoxicated when he came in; he wore ornaments on his person during the second period, a tooth in his necktie. The tooth, he said, was Mrs. Churchill's, a diamond ring, which he said she gave him as a present. He told her he gave to Mrs. Churchill all the money, and she paid the bills and collected the rents. There was another conversation on that subject, in which he said he had given her certain property, and had her name put in large letters, "Churchill Court." The witness told her that on the occasion of the divorce trial he told her he was going to appeal, and would beat them, and said, "I will beat them, you bet your bottom dollar, and on the first of the month I will marry Mrs. Churchill." This was in August or September, 1885 (Judge's Notes, page 31). Another witness, Mrs. Sallie Johnson, an

old friend of the deceased, saw him frequently in 1885, and observed him closely, and was frequently with him, and visited him in November, 1885. On one occasion he was lying on a lounge too short for him, in the room, his clothes were badly disordered and uncleanly. This was on November 7, 1885. He was very glad to see her; he wanted to kiss her, and said, "I am very glad to see you, good lady, that you have come to see me." She said she was very sorry to see him so ill; he spoke of some of his family very abusively. There was a woman in the room to whom she was introduced as Mrs. Churchill. The second time this witness called the deceased was very ill and very excitable, and said to her, "Do you see that on the mantle-piece there [pointing to what appeared to be a glass of jelly]? They have brought that to poison me." He said his daughter brought it; he asked witness to drink with him, liquor of some kind, which she declined; the liquor was handed to him by Mrs. Church-ill; the deceased got angry and abusive to the witness when she declined, and said, "Damn it, cannot you take a drink with an old friend?" He abused the members of his family, said they were going to rob him and poison him; the witness communicated to the daughter the information of the conversation with her father (Judge's Notes, pages 33 and 34). Another witness, Mrs. Sarah B. Cooper, an old acquaintance and friend of the deceased and his wife, and superintendent and manager of the kindergarten system of schools, relates many peculiarities of the deceased as a basis of her opinion that he was insane in November and December, 1885. From May to November of that year he visited her school as often as forty-eight times; that she believed him to be unsound of mind (Judge's Notes, pages 34 to 38). A witness, E. H. Neville, a twenty-five years' acquaintance of the deceased, very intimate with him from 1878, testifies to peculiarities indicating a change in his character, from daily observations, and recites numerous incidents and instances of his conduct indicating insanity. For five years the deceased occupied a desk in the office of the witness, and was in there every day, or nearly every day. Once in 1884, the deceased showed to the witness a human tooth, mounted as a pin on his scarf, which he told him came from the mouth of

Mrs. Churchill, whom he described as "the loveliest and most angelic woman on earth," and that he was going to marry her. The deceased also showed to the witness a picture of a woman pasted in his hat, on which was written, "From Lura to Robert." The witness related that the deceased brought several persons to his office upon one occasion and introduced them to him, one as his dear friend "Shorty Simpson," whom he kissed and embraced; another was Herbert Slade (known as the "Maori," a prizefighter); also another one, "Sconchin" Maloney, and others of more or less like character. One time, after the divorce suit was brought, the deceased came to the witness' office with his wife, and said it was the happiest day of his life, all his troubles were arranged, he and his wife were going to see his Mission property, and they went out together; subsequently on the same day the deceased came into the witness' office and said he was much pleased that it was all arranged. The witness asked him, "How about the divorce suit?" The deceased said that was "all nonsense," he would not have brought it, but he "was persuaded to do so by that Brumagim," using an opprobrious epithet. Another witness, John Mason, an old citizen and acquaintance of the family, testified that after the witness had gone into business as a brewer at the Mission, Twenty-ninth and Tiffany avenue, in March, 1884, he saw the deceased as often as four times a week, from that time to his last sickness, except when he was sick and away from there; he had drank with the deceased may times, too numerous to mention; sometimes at the place called Cody's, on Twenty-ninth and Mission streets; he had numerous conversations with the deceased, which occurred during the progress of the work of construction of the Tiffany block, when the witness, at the instance of deceased, noted the manner in which the work was done. The witness saw Mrs. Churchill once at Cody's, and was introduced to her by the deceased, who came down to the brewery and insisted on the witness going to be introduced, which the witness did not desire. The witness said to deceased that he did not want to go; that the deceased had no grounds for separation or divorce from his wife; but he went, and in the back room adjoining the bar-room saw Mrs. Churchill; he was introduced

by the deceased to her as the lady to whom he was going to be married as soon as he got a divorce; she made no remark; the three had a drink together. The witness saw her subsequently several times out there, and saw the deceased in the fall of 1885, sometimes at the brewery and sometimes at Cody's. Once the deceased came out to the brewery; the deceased said that he was something of a pugilist himself, and took off his coat and vest and rolled up his shirt sleeves to show his muscles, and said he was as vigorous as a man of twenty-five or thirty years of age; that when John L. Sullivan came out he would have a set-to with him; he could not live without sleeping with a woman and Mrs. Churchill "just filled the bill." The witness said to him that he was foolish to talk in that manner. Subsequently, and in the same conversation, the deceased said he was going back to his "mamma"; that she was a good wife to him and true, and he was going back, as his advisers were not advising him right. The deceased also said he had made his will, and everything was going to his two sons, his "mamma," his daughter and his grandchild. Another witness, D. B. Jackson, an acquaintance of the deceased from 1843, when he worked with him in New York City, after testifying to many events during that period, says that in the fall of 1884 he met the deceased at the Bay District Race Course, accompanied by Mrs. Churchill, whom the witness identified in the courtroom as the person to whom the deceased introduced him at the time; the deceased showed the witness her card photograph in his hat. Prior to the introduction the deceased said to the witness, "I want to introduce you to my daisy"; that was after the State Fair in October, 1885. He often said to the witness, of Mrs. Churchill, that "she was the dearest creature on earth, taking the nicest and best care of him." A few days before the deceased was taken down finally, he came to the office of the witness with his daughter and grandchild, and said that they were provided for; he had made everything all right.

A large number of witnesses, in addition to those already alluded to, relate the declarations and conversations of the deceased on a great variety of occasions to the same general purport as those stated. The proponents have examined a

large number of witnesses, many of whom knew the deceased but slightly, although the period of their acquaintance was of long duration, and while their social and business standing may be good their opportunities for intimate observation were not sufficient upon which to predicate a judgment as to his state of mind; such gentlemen as John K. Orr, with whom the deceased transacted business in a retail way for many years, but whom he did not meet socially, except as he was pleasant in intercourse when he came into his store, and would talk about his travels in Europe, and his visits to Ireland; and Colonel Wason, whom he would meet on the street frequently or at the Pioneer Hall; or Charles H. Burton, whom he met casually on the street; or R. T. Van Norden, Solomon Tesmore, H. A. Cobb, A. A. Enquist and others of like good character who speak of their occasional contact with him. This class of witnesses when they found him able to transact the ordinary affairs of business, and saw nothing extravagant or peculiar in his manner readily pronounced him of sane mind. Witnesses of equally good character, many of whom had enjoyed a long and intimate acquaintance with the person of whom they were called upon to speak, testified with great positiveness to the contrary; and while these witnesses are sought to be discredited by the counsel for the proponents as belonging to one of two classes outside of the family, either their partisans or the friends of Mr. McGregor, yet they do not appear to be otherwise discredited, and there is no reason why the court should consider their opinions as of less value than those of others with no superior opportunities of observation. Take the testimony of John Mason, or Raphael Weill, of Henry White, Thomas D. Mathewson, Philip A. Roach, E. B. Vreeland, Cyrus W. Carmany, John J. Haley, Amory F. Bell, M. H. De Young, A. C. Bradford, Davd Scannell, R. F. Bunker, John Perry, Jr.—scarcely any of these men can be said to be partisans, and they all concur in the conclusion that in November and December, 1885, the deceased was of unsound mind. I have examined, with great attention, the mass of evidence in this case, but have found it impracticable to make such an analysis as I have desired. There is much of the evidence to which I have not alluded, and to which, on account of its

volume, it is almost impossible to allude with advantage. I think the facts in evidence warrant the conclusion that the deceased was of unsound mind at the time he executed the papers offered for probate; and even if this issue were not satisfactorily established, I think it is clear that he was acting under undue influence. Upon this second issue the evidence must often be indirect and circumstantial. As it is laid down in the authorities, naturally, persons who intend to control the actions of another, especially in the matter of the execution of wills, do not proclaim that intent. Very seldom does it occur that a direct act of influence is patent. The existence of influence must generally be gathered from circumstances, such as whether the testator had formerly intended a different disposition of his property; whether he was surrounded by those having an object to accomplish, to the exclusion of others; whether he was of such weak mind as to be subject to influence; whether the paper offered as a will is such a paper as would be probably urged upon him by the persons surrounding him; whether they are benefited thereby to the exclusion of formerly intended beneficiaries. Undue influence can rarely be proved by direct and positive testimony. It may be inferred from the nature of the transaction, from the true state of the affections of the testator, from groundless suspicions against members of his family if any such have been proved, and from all the surrounding circumstances.

The legal principles which relate to insanity, insane delusions and undue influence have been so frequently laid down by this and other courts, and are so familiar as to render repetition idle. I do not deem it necessary to consider critically the evidence of the witness Swasey, whose "daily journal," or diary, furnished the basis of his recollection of what occurred during the last sickness of the deceased. I do not agree with the counsel for contestants in the theory that that book was written up pending the contest for the use of the witness, but my impression is that it was written up from day to day during the period of the deceased's last illness, with a view to its possible use in some dispute arising over the disposition of his property, and that its opportunity was found and improved in this controversy. Coun-

sel for proponents claim that the evidence of Mr. Pierson, one of the executors, and the gentleman who drafted the will, should carry conviction, because he stands in his profession where the most ambitious might wish to attain for learning and integrity. Notwithstanding Mr. Pierson's character as a man and his learning as a lawyer, it is not impossible that he erred in opinion as to the soundness of the mind of the person whose will he drafted, and that he was not fully aware of the circumstances that surrounded and the influences that governed the testator.

### MR. PIERSON'S EVIDENCE.

Mr. Pierson testified that he had been a practicing lawyer in San Francisco for twenty-five years; that he had a nodding and speaking acquaintance with Mr. Tiffany for that length of time prior to the latter's death; that he had business relations with him; was employed as counsel for him in the divorce case in 1885; that he had frequent consultations with him until the case was actually tried, in August, 1885; some time after he was employed in that case, the witness was engaged in an action brought by his wife against him, and had a consultation with the deceased once or twice; also, he was consulted in another case, on a promissory note against him, and he also drew his will on the 15th of November, and the codicil on the 15th of December, 1885. The preliminary consultation for the will was on Sunday, November 15, 1885; it was an exceedingly stormy day; it was 11 o'clock when the witness arrived at No. 1 Fifth street and went to the room, one of the suite where the deceased was; they had a cursory conversation about half an hour before the witness asked the deceased if he was about to make his will, while the witness was seated by the fire getting warm and dry; the deceased gave the witness instructions about the composition of the will; while he was giving such instructions the lady whom the witness subsequently knew as Mrs. Churchill came into the room; while the testator was saying to the witness, "Leave the rest to Mrs. Churchill," she said, "Mr. Tiffany, if you are making a will, don't name me in it, as it will only cause me trouble"; the deceased said, "What business is it of yours? Leave the room," and she left. The witness went

into another room, wrote it out, came back, found there—in Mr. Tiffany's room—Dr. Rowell, Mr. Anderson and the testator. Mr. Tiffany was "perfectly sound" in mind; at different times deceased spoke of his wife and family having conspired against him, put him in the Home of Inebriates, having had him declared insane for the purpose of robbing him and getting possession of his property; he spoke of trying to obtain a loan and being met at all points by members of his family, who interfered with his purpose by threatening bankers and others with suit. This was substantially what he said to the witness, who never saw the deceased under the influence of liquor. The codicil was drawn in the office of the witness December 15, 1885, at which time the mind of the testator was "perfectly sound"; it was so at all times that the witness had business relations with him. The deceased wanted the witness to have $1,000 in the will, but he declined to draw any will wherein he would be named as a beneficiary, and told the testator that if he wanted him to benefit by his bounty he must get some one else to draw the will. The subscribing witness, Dr. Rowell, is the man who certified that the deceased died of typhoid fever, and the other subscribing witness, Anderson, is a person who was without occupation and was accommodated by Rowell with lodgings in his office, and was not produced at the contest owing to his absence in unknown parts (Judge's Notes, page 199).

### CONCLUSION OF COURT.

In all that Mr. Pierson did he may have been acting in a perfectly professional manner, and yet have erred in his opinion as to the soundness of the mind of the testator, for experience teaches even those who come into daily contact with insane persons how difficult it is to discern the fact of insanity, and the slightness of Mr. Pierson's acquaintance with the testator is shown when he states that although he had known him for twenty-five years he had never seen him under the influence of liquor. My own conclusion is, upon the whole case, that the testator was not of sound mind at the time of the execution of the paper offered for probate, and that he was unduly influenced thereto by the residuary legatee.

### BASIS OF CONCLUSION.

This conclusion is based upon the entire body of evidence, which has been thoroughly examined by me. I have not undertaken to digest the testimony of every witness, but no one of them has been excluded from consideration in reaching the result, which seems to me the inevitable event of an examination of the facts elicited in the progress of a contest which was characterized throughout on both sides by a determination and spirit rarely equaled.

Probate denied.

---

One may Place Himself so Far Under the Influence of Intoxicating Liquor that for the time being he cannot do any legal act, or he may, by an excessive use of alcoholic stimulants for an extended period of time, perhaps permanently dethrone his reason. A person may, therefore, by an inordinate indulgence in intoxicants, temporarily and possibly permanently incapacitate himself to make a will. Yet the fact that one is addicted to the excessive use of liquor, or that he is in some measure under its influence, manifestly does not, as a matter of law, establish a want of testamentary capacity. Nevertheless, such inebriety is always admissible in evidence as tending to show unsoundness of mind, of vulnerability to undue influence, its effect being question of fact for the jury: Estate of Hill, ante, p. 380; Estate of Cunningham, 52 Cal. 465; Estate of Gharky, 57 Cal. 274, 278; Estate of Lang, 65 Cal. 19, 2 Pac. 491; Estate of Wilson, 117 Cal. 262, 49 Pac. 172; In re D'Avignon's Will, 12 Colo. App. 489, 55 Pac. 936; Estate of Van Alstine, 26 Utah, 193, 72 Pac. 942; Estate of Rathjens, 45 Wash. 55, 87 Pac. 1070. "We cannot say, as a rule of law, that because a man is a drunkard, therefore he is of unsound mind. It is a question of fact for the jury or court below to determine whether the inebriety has had the effect of rendering his mind unsound, either permanently or temporarily, covering the time of the execution of the alleged will": Estate of Johnson, 57 Cal. 529.

A Will is not Invalid Because It may Appear Unwise, Unjust, or Unnatural in its provisions, for the law does not make the right of testamentary disposition dependent upon its judicious exercise: Estate of McDevitt, 95 Cal. 17, 30 Pac. 101; Estate of Spencer, 96 Cal. 448, 31 Pac. 453; Estate of Kaufman, 117 Cal. 288, 59 Am. St. Rep. 179, 49 Pac. 192; Estate of Donovan, 140 Cal. 390, 73 Pac. 1081; Estate of Morey, 147 Cal. 495, 82 Pac. 57; Ames v. Ames, 40 Or. 495, 67 Pac. 757; In re Turner's Will (Or.), 93 Pac. 461; Estate of Gorkow, 20 Wash. 563, 56 Pac. 385. Nevertheless the injustice or unnaturalness of a will is a circumstance which may be considered with

other evidence tending to show, on the part of the testator, an unbalanced mind or a mind susceptible to or swayed by undue influence: Field v. Shorb, 99 Cal. 661, 34 Pac. 504; Estate of Wilson, 117 Cal. 262, 49 Pac. 172, 711; Estate of Langford, 108 Cal. 608, 41 Pac. 701; Hubbard v. Hubbard, 7 Or. 42; Rathjens v. Merrill, 38 Wash. 442, 80 Pac. 754. "That a will is what may be called undutiful is material only when the circumstances are such as to show that the testator, if uninfluenced, would most likely have made what is called a dutiful will": Estate of Ruffino, 116 Cal. 304, 48 Pac. 127.

On Undue Influence as invalidating a will, see Estate of Hill, ante, p. 380, and note.